IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

IN THE MATTER OF THE SEARCH OF AN APPLE IPHONE, ASSIGNED ANCHORAGE POLICE DEPARTMENT EVIDENCE TAG: **1257768**.

Case No. 3:21-MJ-00050-MMS



Feb 09 2021

**AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE**

I**,** R. Allen Adair, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND DETECTIVE BACKGROUND**

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the search of an **Apple iPhone, seized and assigned APD Evidence Tag: 1257768** and the seizure of evidence, instrumentalities, and fruits of violations of Title 18 U.S.C. §922(g)(1), Title 18 U.S.C. §924(c)(1)(A), Title 21 U.S.C. §841(a)(1), and State of Alaska weapons violations.

2. I am a Police Officer employed by the Municipality of Anchorage Police Department and am presently a Commissioned Police Officer in the State of Alaska. Between May 2007 and April 2019, I was assigned to the Anchorage Police Department's (APD) Vice Unit. My assignment with the Vice Unit focused on investigations related to prostitution, human trafficking and trafficking of controlled substances.

3. I am a federal law enforcement officer within the meaning of Rule 41(a)(2)(C) of the Federal Rules of Criminal Procedure. In April 2019, I was assigned to a task force position with the Bureau of Alcohol, Tobacco, Firearms, and Explosives. My duties continue to focus on controlled substance and firearm related crimes impacting the Anchorage Community.






4. I have more than twenty-five years of combined law enforcement experience. I was an explosive and drug detector dog handler with the United States Air Force from June 1991 to August 1996. In August 1996, I was credentialed as a Special Agent with the Air Force Office of Special Investigations. In August 2004, I left active duty with the military and was employed with the Anchorage Police Department as an Officer. I retired from the Air Force Office of Special Investigations in May 2011.

5. I have graduated from three basic law enforcement academies. The first was the United States Air Force Police Academy in December, 1991. The second was the Air Force Office of Special Investigations Academy in November 1996 and the third was the APD Academy in January of 2005.

6. During my tenure as a drug detector dog handler, I received training and instruction on devices, paraphernalia, techniques, and practices used by people engaged in the use, possession, and trafficking of controlled substances. This training also included the investigation of crimes involving the use, possession, and trafficking of controlled substances throughout the continental United States and military bases abroad.

7. I attended and graduated from a six month special investigations academy operated by the Department of Defense. While attending this academy, I received training and instruction on devices, paraphernalia, techniques, and practices used by people engaged in the use, possession, manufacture, and trafficking of controlled substances. This training predominately focused on the investigation of crimes involving the use, possession, manufacture and trafficking of controlled substances and the means by which to infiltrate and/or identify individuals and organizations involved in the use, possession, manufacture and trafficking of controlled substances.

8. I attended and graduated from a five month police academy operated by APD. While attending APD's academy, I received training and instruction on devices, paraphernalia, techniques, and practices used by people engaged in the use, possession, manufacture, and trafficking of controlled substances. In an extension of APD's academy, and subsequent to graduation from APD's academy, I received training and instruction from several APD field training officers.

This training included investigation of crimes involving the use, possession, manufacture, and trafficking of controlled substances in the Anchorage area.

9. The majority of my police experience has been as a Special Agent assigned to various Joint Drug Enforcement Teams in Texas, California, and Alaska, followed by my tenure with APD's Vice Unit. My duties include watching for illegal activities, interviewing witnesses, victims and suspects, developing probable cause for cases, examining crime scenes in order to develop evidence to substantiate or disprove the allegation being investigated, handling and processing various types of evidence, utilizing human sources of information to resolve drug and other criminal related investigations, and assembling cases for possible prosecution by Federal, State, Municipal and Military Judicial Offices. In my law enforcement career, I have conducted hundreds of drug related investigations, involving the use, possession, manufacture, and trafficking of marijuana, lysergic acid diethylamide (LSD) cocaine hydrochloride, cocaine base (crack), heroin, ecstasy (MDMA), psilocybin mushrooms, methamphetamine, controlled prescription medication While conducting these investigations, I have interviewed several hundred people, involved either directly or indirectly with the crimes being investigated. I have also served or assisted in serving several drug related search warrants resulting in the seizure of the above mentioned drugs as well as firearms, ammunition, packaging materials, assorted concealment containers, cutting agents, digital and beam scales, cellular telephones, surveillance systems, marijuana grow operations, methamphetamine laboratories, cameras, body armor, memory cards, computers and related equipment, various electronic equipment purchased with illicit proceeds, documents, money, precious metals, gems, stolen property, address books, and assorted paraphernalia utilized to ingest controlled substances.

10. Based on my training and experience, I know people involved in the use, possession, manufacture, and/or drug trafficking of controlled substances commonly possess and use cellular telephones, standard telephones, and computers to facilitate these activities. Regarding cellular telephones in particular, I know drug traffickers will use cellular telephones to facilitate their activities because of the mobility offered by cellular telephones. Further, drug traffickers are attracted to cellular telephones because they enable suspects to avoid the risks

attendant with operating from a fixed location. Additionally, cellular telephones afford spontaneous access to drug customers and to drug sources.

11. It is common for members of drug trafficking organizations, in an attempt to disguise their identities and illegal activities, to use pre-paid cellular telephones and pre-paid long distance calling cards. I know that often times the only way to connect a subject with a particular pre-paid cellular telephone or calling card is to seize the phone or calling card from the trafficker or his residence. The aforementioned items are maintained in locations to which dealers of illegal controlled substances have ready access, such as within their residences and the surrounding curtilage; their vehicles; the residences of family members, friends and associates; the places in which they conduct their drug distribution activities; such as stash houses or safe houses; in business locations with which the trafficker is associated; or in storage areas.

12. It is common for members of drug trafficking organizations to maintain telephonic/text message/messenger communications before, during and after drug transactions. Calls and/or text messages are often made between the drug source of supply and the drug recipient, prior to departure of a drug courier and upon arrival of a drug courier at the destination. Once at the destination, it is common for the courier to contact the recipient, via the telephone. Records of such contacts, whether call logs or text messages, are frequently maintained in the cellular telephone's memory.

13. It is common for individuals involved in drug trafficking to use multiple cellular telephones to maintain contact with their associates. These individuals use multiple cellular telephones because cellular telephones are mobile and can be easily obtained with a different subscriber name. Members of a drug trafficking organizations, to thwart law enforcement detection of their illicit drug trafficking activities, often use a different subscriber name and/or telephone number. These different telephone numbers often have different subscriber names and/or are pre-paid cellular telephones where the subscriber is difficult to determine. Because several different telephone numbers may be used, it is common for traffickers of controlled substances to maintain the names and telephone numbers of associates within the cellular telephone memory. These associate names and telephone numbers may be stored in historical call logs, text-messaging history or within the contacts section of the cellular telephone.

14. It is common for members of drug trafficking organizations to take or cause to be taken, photographs and/or videos of themselves and their co-conspirators and associates. It is also common for members of drug trafficking organizations to take or cause to be taken, photographs and/or videos of themselves and/or their co-conspirators with controlled substances, large sums of money, guns and expensive assets (i.e. jewelry, luxury cars). The aforementioned images are frequently maintained in the memory of cellular telephone devices. Devices such as smart cellular telephones often imprint each photo with the GPS coordinates where such photos are taken. Thus, it is possible to discern the location of stash houses and other evidence by analyzing a digital photo.

15. Certain cellular telephones have a feature which allow the subscriber or user of the device remote access to "wipe" or delete all the information if the device no longer in their possession whether it be because it is lost, stolen, or seized.

16. I received an associate in applied science, criminal justice degree from the Community College of the Air Force in 2004. I have attended the following courses to supplement training I received while attending the previously mentioned law enforcement academies:

(i) Department of Justice Operation Jetway Course, July 2018
(ii) DEA Social Media for Investigation Course, April 2018
(iii) FLETC Single Officer Response to an Active Threat, June 2018
(iv) DEA Social Media for Investigation Course, July 2014
(v) DEA Narcotic Management and Leadership Course, October 2012
(vi) DEA Prescription Drug Diversion Investigations Course, August 2012
(vii) DEA Drug Interdiction Course, September 2011
(viii) Investigating Drug Trafficking Organizations Course, August 2011
(ix) DEA Basic Drug Investigations Course, August 2010
(x) Mid-Level Narcotic Investigation Course, June 2010
(xi) DEA Indoor Marijuana Cultivation Investigations Course, July 2008
(xii) International Money Laundering Investigations, July 2008
(xiii) National Center for Missing and Exploited Children, Protecting Victims of Child Prostitution, January 2008
(xiv) DEA Controlled Substance Concealment Course, January 2008
(xv) Anchorage Police Department Crime Scene Processing Course, November 2004
(xvi) Anchorage Police Department Patrol Officer Academy, August 2004
(xvii) DoD Polygraph Institute Credibility Assessment through Linguistic Analysis, April 2002
(xviii) Heinz Laboratories National Clandestine Drug Labs Course, January 2001

(xix) AFOSI Protective Service Operation Course, August 2000
(xx) USMC Urban/Rural Sniper/Counter-Sniper Training, January 2000
(xxi) AFOSI Counterintelligence and Force Protection Operations Course, November 1999
(xxii) AFOSI Evidence Custodian Training Course, May 1999
(xxiii) Practical Homicide Investigation Course, February 1999
(xxiv) Advanced Reid Technique of Interviewing and Interrogation, July 1998
(xxv) AFOSI Advanced Special Investigators Course, July 1998
(xxvi) AFOSI Forensics Course, October 1997
(xxvii) AFOSI Special Investigators Course, December 1996
(xxviii) Reid Technique of Interviewing and Interrogation, October 1996
(xxix) Investigative Skills for Street Gangs, March 1996
(xxx) Texas A & M Investigative Skills Course, November 1995
(xxxi) USAF Explosive and Drug Detector Dog Handler Course, March 1992
(xxxii) USAF Patrol Dog Handler Course, October 1991
(xxxiii) USAF Law Enforcement Specialist Course, September 1991

## TECHNICAL TERMS

17. Based on my training, and experience, I know cellular telephones and other electronic devices often have capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, PDA, and to access the Internet. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

18. Based on my training and experience, I use the above technical terms to convey the following meanings:

a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending,

receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications

that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. Computer: a computer as used herein is defined in 18 U.S.C. § 1030(e)(1), and includes an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device.

f. Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, which is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

h. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between

devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

i. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

**ELECTRONIC STORAGE AND FORENSIC ANALYSIS**

19. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

20. There is probable cause to believe that things that were once stored on the Device may still be stored there, for at least the following reasons:

a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active

file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

21. *Forensic evidence.* As further described in Attachment A, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic

evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

22. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

23. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## LOCATION AND DEVICE ASSOCIATED WITH THIS REQUEST

24. The cellular telephone referenced in this Affidavit is described as an **Apple iPhone, seized and assigned APD Evidence Tag: 1257768.** This item is currently located within the Anchorage Police Department's Property/Evidence Section, located at 4501 Elmore Road, Anchorage, Alaska.

## LIMITED NATURE OF AFFIDAVIT

25. I have participated in the investigation of the offenses set forth above. The facts and information contained in this affidavit are based upon my personal knowledge, information

obtained from local law enforcement officers and information obtained from the analysis of reports. All observations referenced in this affidavit that were not made by me were related to me by the person who made such observations. Unless specifically indicated, all conversations and statements described in this affidavit are related in substance and in part only and are not intended to be a verbatim recitation of such statements. I have not set forth each and every fact learned during the course of this investigation. I have set forth only those facts which establish the foundation for probable cause.

**PROBABLE CAUSE**

26. In November 2020, Investigators with the Anchorage Police Department (APD) and Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) began an investigation involving a criminal organization operating in Anchorage and Nevada. The organization identified themselves as "PMM" (Players Making Moves). The investigation identified Samuel Frederick DAVIS as the leader of the organization operating from Nevada with strong prior ties to the Anchorage community. Of the nearly 6-10 additional members of "PMM", Investigators identified convicted felon, Kyin Andre SUMPTER-BOYD as an Anchorage based resident and associate of DAVIS. The criminal investigation and reviews of social media postings by SUMPTER-BOYD confirmed he was engaged in distribution of heroin and prescription medication supplied by DAVIS. A video recording on social media in the later part of November 2020 depicts SUMPTER-BOYD in possession of three handguns that are consistent with the Glock manufacturing company. SUMPTER-BOYD was holding two handguns in his right hand and one in his left hand. One of the pistols in his right hand is equipped with a high-capacity drum magazine. The pistol in his right hand is a compensated Glock with a green laser type light. Examination of the handguns depicted in the social media video posted by SUMPTER-BOYD are consistent with actual pistols and not replicas. A query of SUMPTER-BOYD's criminal convictions in Alaska indicate he was previously convicted of felony assault with a weapon in 2016, thus making him prohibited from possessing concealable firearms in Alaska. During prior Law Enforcement contact since SUMPTER-BOYD's felonious assault conviction, he acknowledged he was prohibited from possessing firearms.

a. Investigation over the course of the previous month, identified SUMPTER-BOYD was residing at 259 Zappa Place, Anchorage, Alaska. The specific unit was not initially known to Investigators.

b. A review of https://hotpads.com/259-zappa-pl-anchorage-ak-99504-1mbrf58/d/pad depict the interior of 259 Zappa Place, #D, Anchorage, Alaska. The open source photograph depicts the kitchen area of Unit #D. The unique characteristics of the photograph are the two differing kitchen lights and the upper kitchen cupboards. The light fixtures and cupboards are consistent with the light fixtures and cupboards depicted in SUMPTER-BOYD's social media video posts.

c. On December 2nd, 2020, Investigators located SUMPTER-BOYD's gold 2004 Chevrolet pickup, Idaho License: AK9077B parked outside 259 Zappa Place. Periodic surveillance routinely placed the vehicle at the Zappa address and varying hours of the day and evening.

d. On December 7th, 2020, SUMPTER-BOYD posted a social media video of an individual holding a Hi-Point handgun. Investigators believe SUMPTER-BOYD authored the video as it was posted on his social media account.

e. On December 11th, 2020, Investigators intercepted a parcel DAVIS mailed from Nevada to Anchorage. The subsequent search warrant execution of the parcel disclosed approximately three kilograms of heroin bound for Anchorage. This seizure further corroborated DAVIS' connection to his Anchorage based associates engaged in controlled substance and firearm related crimes impacting the Anchorage community.

f. On December 12th, 2020, SUMPTER-BOYD posted a video recording inside a residence, believed to be 259 Zappa Drive, #D. The video portrays the packaging of suspected illicit controlled tablets. The video recording is followed by a posting, "Fuvk it who need M promise I'm have the lowest price 6est deal". The "M" designator identified by SUMPTER-

BOYD in the social media offering is consistent with illicit fentanyl laced tablets being sold in Anchorage. The investigation has determined SUMPTER-BOYD and his associates are routinely engaged in illicit sales of opioid based prescription medication via social media. This has become an increasingly common method of sales within the Anchorage area.

g. Based on the aforementioned information, coupled with information gleaned from APD Officer Seth McMillan's investigation, linking SUMPTER-BOYD to 259 Zappa Place, #D, a State of Alaska search warrant was sought and received for the search of the Zappa address for the presence of controlled substances, associated paraphernalia and documents, firearms and related accessories. The warrant was issued on December 12th, 2020 and assigned number: 3AN-20-4699SW.

27. On December 13th, 2020, Officers with the APD's Investigative Support Unit (ISU), followed SUMPTER-BOYD from 259 Zappa Place to the Fred Meyer grocery store, located at 7701 Debarr Road, Anchorage, Alaska. I requested APD ISU Officers contact SUMPTER-BOYD in connection with the above-mentioned investigation. Officer McMillan was dressed in plain clothing and followed SUMPTER-BOYD, James Najhar HUDSON, and Alyson Maree WILSON into the grocery store. Officer McMillan noted SUMPTER-BOYD was carrying a heavy object in the right front pocket of his jacket consistent with a handgun based on how the item caused the front of SUMPTER-BOYD's jacket to "sag".

28. Officers contacted SUMPTER-BOYD outside the grocery store and after identifying themselves, SUMPTER-BOYD attempted to flee. He surrendered only after he realized he was surrounded. After being placed in handcuffs, SUMPTER-BOYD told Officers he had a firearm in his right front jacket pocket. Officers recovered a loaded Glock, Model 17C, 9mm, Serial Number: AABT687, with an extended magazine loaded with (29) assorted 9mm cartridges from SUMPTER-BOYD's right front jacket pocket. The pistol, extended magazine, and ammunition were seized. HUDSON and WILSON were also detained. HUDSON told Officers he had a loaded Glock, Model 29, 10mm, Serial Number: XEF550 concealed in his waistband. SUMPTER-BOYD, HUDSON, and WILSON were transported to APD Headquarters where they were





interviewed. Two cellular telephones were seized from SUMPTER-BOYD, the first was described as an Apple iPhone (APD Evidence Tag: 1257766) and the second was an HTC cellular telephone (APD Evidence Tag: 1257767). **An iPhone was also seized from HUDSON and assigned APD Evidence Tag: 1257768**. These items were submitted to APD's Property/Evidence Section. The APD Case associated with the contact of SUMPTER-BOYD, HUDSON, WILSON, and the search warrant execution at 259 Zappa Place is 20-39133.

29. During the subsequent mirandized interview of SUMPTER-BOYD by Detective Leonard Torres and I, he admitted to receiving information from his Sister, Lanyegia Juita DAVIS indicating Samuel DAVIS was recently arrested for trafficking controlled substances. SUMPTER-BOYD described S. DAVIS' circle of trust as Dwayne Aswad Azi SMITH Jr, LC Shelton JOHNSON-WHITLOW IV, and Solomon Alejandro STEWARD. During SUMPTER-BOYD's last conversation with S. DAVIS he indicated he was having JOHNSON-WHITLOW travel to Las Vegas for him. SUMPTER-BOYD described DAVIS' as a heroin and Percocet distributor. He stated S. DAVIS was previously reliant upon STEWARD and Davon Lynn SMITH to distribute these substances in Alaska; however, both were currently incarcerated. SUMPTER-BOYD stated S. DAVIS utilized females to body carry these substances to Alaska or he would mail the substance to Alaska. SUMPTER-BOYD admitted to previously receiving one or two ounces of heroin from S. DAVIS in exchange for $1000-$1200. SUMPTER-BOYD admitted his profit for selling that quantity of heroin was approximately $1000. In addition to receiving heroin from S. DAVIS, SUMPTER-BOYD received pills from S. DAVIS and he currently owed DAVIS for several hundred Percocet. SUMPTER-BOYD admitted investigators would locate these Percocet inside 259 Zappa Place, Apartment #D, Anchorage, Alaska.

30. SUMPTER-BOYD admitted the Glock 17C he was found with earlier in the evening was "switched" with HUDSON. SUMPTER-BOYD admitted to previously possessing the Glock 29 found with HUDSON. He claimed the Glock 29 was originally obtained from his girlfriend, Dedra Levette BODDEN. SUMPTER-BOYD stated the Glock 17C located in his possession on this evening was originally provided to HUDSON by S. DAVIS' girlfriend, Ashlyn Jenna SHADLE.

SUMPTER-BOYD stated HUDSON had been in possession of the Glock 17C for approximately one month.

31. SUMPTER-BOYD admitted that two of the three Glock pistols depicted in his social media were the firearms seized from he and HUDSON earlier in the evening. He admitted to being previously convicted of felony assault with a weapon and acknowledged he was prohibited from possessing a firearm. SUMPTER-BOYD admitted to possessing the Glock pistols for the previous three months. He went on to say investigators would locate "a bunch of clips" and bullets at his home on Zappa Place. He ultimately directed investigators to a safe in the kitchen area of the home and the location of the key to access it. In addition to this location, he admitted 600 "Percocet's" would be located in his Son's diaper bag in the living room. The "Percocet's" described by SUMPTER-BOYD in the safe and diaper bag were seized.

32. SUMPTER-BOYD stated he knew about the shooting S. DAVIS, HUDSON, and a third individual was involved in on October 25th, 2020 (APD Case: 20-33767). Later in the interview, he describes the opposing individuals involved in the shootout as members of the rival gang, Family Over Everything (FOE). SUMPTER-BOYD stated he was supposed to meet with L. DAVIS earlier in the evening and he was supposed to provide her with the remainder of the pills S. DAVIS gave him. SUMPTER-BOYD stated he did not want to give the pills to her because, "I'm fucking broke! Why would I give you the last of my shit? Then I can't sell any fucking thing!"

33. SUMPTER-BOYD spoke about Jaheim James RANDOLPH crashing a car (APD Case: 20-38879) and Officer's locating a firearm inside the vehicle. He went on to say RANDOLPH was supposed to receive the heroin laden parcel S. DAVIS intended to send to Alaska the previous week. SUMPTER-BOYD seemed upset S. DAVIS had JOHNSON-WHITLOW travel to Las Vegas to mail the parcel and SUMPTER-BOYD seemed underappreciated by S. DAVIS. He went on to say out of everyone of S. DAVIS' suppliers in Alaska, he was the one who received the least of all his distributors. SUMPTER-BOYD stated SMITH Jr and RANDOLPH were supposed to receive the heroin parcel. SUMPTER-BOYD was upset when he learned S. DAVIS shipped three

kilograms of heroin, since S. DAVIS told him two weeks prior he was only sending 30 ounces of heroin to Alaska. SUMPTER-BOYD stated S. DAVIS contacted him a few days prior wherein S. DAVIS told him he wanted the "Blues" (Percocet's) back. SUMPTER-BOYD stated S. DAVIS may have messaged him the recipient address where the latest heroin laden parcel was scheduled to arrive. SUMPTER-BOYD went on to say he had a video recording RANDOLPH sent him of the shooting (APD Case: 20-38879) mentioned above.

34. SUMPTER-BOYD was concerned there was information in his cellular telephone that would potentially implicate him in receiving a portion of the three kilograms of heroin S. DAVIS and JOHNSON-WHITLOW attempted to mail to Alaska. SUMPTER-BOYD indicated the passcode for his cellular telephone was 789654. Detective Torres and I returned to the interview room with SUMPTER-BOYD and his two cellular telephones. SUMPTER-BOYD stated the HTC cellphone was recently procured and not passcode protected. He directed Detective Torres and I to videos in his phone. One in particular, was approximately $8000 he collected weeks earlier on behalf of S. DAVIS. SUMPTER-BOYD stated he received the money from RANDOLPH. SUMPTER-BOYD stated he provided the money to L. DAVIS. SUMPTER-BOYD directed me to the video recording authored by and received from RANDOLPH when he shot at 3409 Northwood Drive. He also directed investigators to the message conversation between he and S. DAVIS on their Signal application wherein S. DAVIS is heard asking SUMPTER-BOYD, "How much of my blue pills you got? I'm about to give them to this bitch." S. DAVIS also tells SUMPTER-BOYD the heroin laden parcel should be arriving in Anchorage on "Friday or Saturday". The conversation between the two occurs at approximately 7:45 p.m on the video recording of the interview. Further reviews of the Signal conversation between S. DAVIS and SUMPTER-BOYD confirm the drug distribution operation between the two, previous parcel deliveries by S. DAVIS, and heroin deliveries on behalf of S. DAVIS. SUMPTER-BOYD stated the previous parcels of illicit drugs were packaged with toys or food and the drugs were hidden inside those items. SUMPTER-BOYD admitted to previously receiving and distributing heroin from the prior parcels shipped by S. DAVIS.

35. The search of SUMPTER-BOYD's residence disclosed assorted rifle and handgun ammunition, a drum magazine for a 9mm pistol, loaded with (52) cartridges, assorted other pistol magazines, and in excess of 750 tablets suspected to be the fentanyl laced Percocet referenced by SUMPTER-BOYD during his interview. SUMPTER-BOYD confirmed the drum magazine located inside his home was for the Glock 17C in his possession earlier in the evening. These items are referenced above. SUMPTER-BOYD assured investigators the Glock 17C was not previously utilized in any shootings and confirmed the 10mm Glock 29 possessed by HUDSON was used on October 25th, 2020 when S. DAVIS was shot.

36. On December 13th, 2020, Detective Ramon Dojaque and I contacted HUDSON's Mother, Aracya Rangelena JOHNSON prior to his interview. JOHNSON was allowed to be present for the interview. I advised HUDSON of his 5th Amendment Rights in the presence of JOHNSON. HUDSON agreed to answer questions regarding the investigation. HUDSON began by describing the shooting incident on October 25th, 2020 (APD Case: 20-33767). He stated S. DAVIS was driving the black rental vehicle involved and Xavier Tre Shawn THOMPSON was seated in the front passenger seat. HUDSON stated he was seated in the rear of the vehicle. HUDSON stated he, S. DAVIS, and THOMPSON received information members of the rival Family Over Everything (FOE) gang were going to shoot his grandmother's home at 639 E. 76th Avenue. HUDSON believed one of the vehicles was associated with Fazion Kentrell MURRAY and Versace Armani SPERL. HUDSON described both of these individuals as members of the rival FOE gang. The rival between the FOE gang and HUDSON's PMM gang stemmed from a verbal altercation with Damarcus Rashad GIBBS, the leader of the FOE gang. HUDSON stated he was "grazed" during the shooting on his upper right shoulder.

37. HUDSON claimed he, S. DAVIS, and THOMPSON drove to his home 2761 Trailside Loop, Apartment #1, Anchorage, Alaska after the shooting. The trio attempted to treat S. DAVIS' forearm from a bullet wound he sustained during the incident. THOMPSON left the Trailside Loop address with the rental vehicle and HUDSON departed with Alandre Pierre MCKNIGHT. MCKNIGHT drove HUDSON back to 639 E. 76th Avenue where he remained. Ashlyn Jenna SHADLE drove S. DAVIS to the Matanuska-Susitna Valley Hospital. S. DAVIS planned to have




SHADLE report the rental vehicle stolen (APD Case: 20-33808) after THOMPSON had an opportunity to clean the vehicle out and leave it parked somewhere in Anchorage.

38. HUDSON claimed he received the Glock 29 from BODDEN a month prior. HUDSON stated BODDEN was in possession of the Glock 29 from an intermediary associate and when they asked for it back, she told them it was stolen from her. HUDSON admitted to being involved in another shooting incident with the Glock 29. He claimed the shooting occurred in the vicinity of the Burger King, near the Northway Mall. This shooting also involved an altercation with FOE and it happened approximately three months earlier. The location HUDSON described was on Northway Drive, south of Penland Parkway. HUDSON did not believe any of the FOE members were struck in either shooting incident.

39. HUDSON admitted to serving drug customers on behalf of SUMPTER-BOYD and S. DAVIS. HUDSON stated he met RANDOLPH in the early part of 2020. He provided the passcode for his telephone (1028) and directed me to a video recording on the phone he received from RANDOLPH shooting at HUDSON's cousin, Johnny GRANT's house (APD Case: 20-38606). HUDSON stated he was contacted by RANDOLPH after he eluded Officers (APD Case: 20-38879). RANDOLPH admitted to running from Officers and he asked HUDSON to pick him up. HUDSON stated GRANT and his associates were involved in robberies of different individuals in Anchorage, to include HUDSON's friend "Vincent."

**CONCLUSION**

40. Based upon my training and experience, I know that pursuant to Title 18 U.S.C. §922(g)(1) that it is unlawful to knowingly possess a firearm and ammunition while having been convicted in any court, of a crime punishable by imprisonment for a term exceeding one year, and affected commerce; Title 21 U.S.C. §841(a) states that it shall be unlawful for any person knowingly or intentionally to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense a controlled substance. I also know that pursuant to Title 18 U.S.C.




§924(c)(1)(A) it is unlawful for any person during and in relation to a drug trafficking crime to use or carry a firearm in furtherance of any such crime.

41. Based upon the aforementioned information, I believe that probable cause exists that the **Apple iPhone, seized and assigned APD Evidence Tag: 1257768**, contains evidence, instrumentalities, and fruits of violations of Title 18 U.S.C. §922(g)(1), Title 18 U.S.C. §924(c)(1)(A), Title 21 U.S.C. §841(a)(1), and State of Alaska weapons violations.

42. Based on the foregoing, your affiant is requesting that a search warrant be granted for the **Apple iPhone, seized and assigned APD Evidence Tag: 1257768**, referenced in this affidavit (**Attachment A**) and there is probable cause to believe data within HUDSON's cellular telephone corroborates violations of Title 18 U.S.C. §922(g)(1), Title 18 U.S.C. §924(c)(1)(A), Title 21 U.S.C. §841(a)(1), and State of Alaska weapons violations.

43. Specifically, I request authorization to search for, and seize, the items listed in **Attachment B**.

Respectfully submitted,

R. Allen Adair
Detective, Bureau of Alcohol, Tobacco, Firearms and Explosives / Anchorage Police Department Task Force

Subscribed digitally and sworn to telephonically on February 9, 2021:

Matthew M. Scoble, United States Magistrate Judge

UNITED STATES DISTRICT COURT DISTRICT OF ALASKA